## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 06 2020, 10:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi K. Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Lawon Browning, | August 6, 2020 |
| *Appellant-Defendant,* | Court of Appeals Case No. 19A-CR-2522 |
| v. | Appeal from the Marion Superior Court |
| State of Indiana, | The Honorable Lisa F. Borges, Judge |
| *Appellee-Plaintiff.* | Trial Court Cause No. 49G04-1804-MR-13688 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Lawon Browning (Browning), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1(1); and the entry of judgment of conviction for robbery, a Level 3 felony, I.C. § 35-42-5-1(1).

We affirm in part, vacate in part, and remand for further proceedings.

# ISSUES

Browning presents this court with three issues, which we restate as:

(1) Whether his conviction for Level 3 felony robbery must be reduced to a Level 5 felony;

(2) Whether he was deprived of a fair trial before an impartial trial court; and

(3) Whether the trial court abused its discretion when it admitted certain cell phone location evidence.

# FACTS AND PROCEDURAL HISTORY

Jessica Whitehouse (Whitehouse) lived in the 4300 block of Norwaldo Avenue in Indianapolis. On November 1, 2016, Whitehouse spent time with her boyfriend, James Beckley (Beckley), at her home after work. Beckley returned to his own home around 8:30 p.m. after loaning Whitehouse the $60 she had asked to borrow to tide her over until payday. Around 4:00 a.m. on November 2, 2016, Browning sold cocaine to Whitehouse from a home located in the 4200 block of Kingsley Drive in Indianapolis.

From 6:17 a.m. to 6:44 a.m. on November 2, 2016, Whitehouse and her father exchanged texts regarding her request for $20 for gas, which her father agreed to place under the windshield wiper of his car so she could retrieve it. Whitehouse never retrieved the money. Her father drove by her home around 1:00 p.m. to check on her and noted that her car, a dark green 1993 Crown Victoria, was not in its parking place. Beckley, who was in the habit of communicating with Whitehouse throughout the day, worried when he got no responses to his calls and texts on November 2, 2016. At 7:30 p.m. after finishing his workday, Beckley went to Whitehouse's home to check on her. Whitehouse's car was not in its parking place, and Beckley, receiving no response after knocking on the door, peered into the window of the master bedroom. Beckley saw Whitehouse's legs sticking out of the bathroom doorway onto the hallway floor. Whitehouse had been in recovery from alcoholism but had a history of relapse, so Beckley feared she had lost consciousness from alcohol consumption. Beckley pried open the window and crawled in, but it was quickly apparent to him that Whitehouse was deceased. Whitehouse had been killed by gunshots to her torso, hip, thigh, and leg. There were indications that a struggle had taken place in the home, as Whitehouse's glasses were found in her cat's food dish and a closet door opposite the bathroom was off its track. Whitehouse's car, purse, and cell phone were missing from her home.

Browning lived at the Willowbrook Apartments on 52nd Street near Keystone Avenue. Behind the Willowbrook Apartments there is a gap in the fence line

creating a passthrough to the dead end of Hillside Avenue. On November 2, 2016, homeowners living near the passthrough observed what was later determined to be Whitehouse's car parked at the dead end. Around 5:00 p.m. on November 2, 2016, a man walked through the passthrough from the Willowbrook Apartments, stood facing the fence line for a few moments, and then tried to open the doors of a car that was parked in front of Whitehouse's car. One homeowner confronted the man, who drove away in Whitehouse's car. Credit and insurance cards bearing Whitehouse's name were later found in the scrub of the fence line where the man had been standing.

[7] Whitehouse's cell phone call records revealed that she had contacted Browning three times around 5:00 a.m. on November 2, 2016, information which caused Browning to become a person of interest in the investigation of Whitehouse's death. Investigators acquired Browning's cell phone records and developed preliminary cell phone location data for Whitehouse's and Browning's cell phones. Based on this preliminary data, investigators requested the assistance of FBI Special Agent Kevin Horan (Horan) to refine cell phone location information for Whitehouse and Browning on November 2, 2016. Horan acquired Network Element Location Service (NELOS) data for both cell phones from cell phone service provider AT&T. NELOS data does not provide precise location data. It provides the latitude and longitude for a cell phone usage ping and a "range of uncertainty" around that latitude and longitude, ranging between 25 and 600 meters, within which the ping could be located. (Tr. Vol. IV, p. 196) Based on the acquired NELOS data, on August 15, 2017,

Horan mapped the areas of actual cell phone coverage for the cell phone towers used by Whitehouse's and Browning's phones by driving the areas of interest with a device installed on his car that measured the actual strength of radio frequency signal (the Drive Test). Horan used the NELOS and Drive Test data to create maps depicting approximate locations for Whitehouse's and Browning's cell phones during the relevant time which showed that Whitehouse's and Browning's cell phones were within an area consistent with Whitehouse's home just prior to 7:00 a.m. and that, thereafter, from approximately 7:00 a.m. to 8:00 a.m., the phones were in an area consistent with Browning's home. From 8:00 a.m. to 5:00 p.m. on November 2, 2016, Whitehouse's phone was not communicating with the cell network. At 5:00 p.m., Whitehouse's phone was still in an area consistent with Browning's home, was back on network, and received a number of incoming calls. After DNA test results indicated the presence of Browning's DNA on swabs taken from Whitehouse's fingertips and underneath her nailbeds, it was determined that probable cause existed for Browning's arrest.

[8] On April 27, 2018, the State filed an Information, charging Browning with murder, felony murder, Level 2 felony robbery, and Level 5 felony carrying a handgun without a license. On May 9, 2018, Browning and Daniel Porter (Porter), an acquaintance of Browning's who had also been Whitehouse's friend, were placed in the same courtroom holding cell to wait to be called for court hearings. Browning was unaware that Porter knew Whitehouse. When Porter asked Browning what he had been charged with, Browning told him that

he "had caught an M" for allegedly killing "the chick on the news, Jessica."
(Tr. Vol. IV, p. 133). Browning stated that Whitehouse had owed him money
for pills, he went to her house, he forced his way in when she opened the door,
she fought with him, and he shot her in the leg and stomach. Browning also
told Porter that he had taken Whitehouse's cell phone and wallet when he left.
When Porter asked Browning how he had been caught, he replied that law
enforcement had found his DNA under Whitehouse's nails but that he was not
concerned because "I'm a beat that, I'm a say we had a sexual relationship."
(Tr. Vol. IV, p. 133). After having this conversation with Browning, Porter
contacted the prosecutor and provided a statement.

[9] Prior to trial, the State dismissed the Level 5 felony carrying a handgun without
a license charge. On July 22, 2019, the trial court convened Browning's four-
day jury trial. The deputy coroner testified that he estimated that Whitehouse
had been dead for ten to twelve hours prior to when he first examined her body
at 8:25 p.m. on November 2, 2016. Browning stipulated to his cell phone
number and that his cell phone using that number was within his exclusive
possession on November 2, 2016. Porter testified regarding his conversation
with Browning in the courtroom holding cell.

[10] On the third day of trial, the trial court held a hearing outside the presence of
the jury to address the admissibility of the NELOS and Drive Test data.
Browning objected that the NELOS data was not based on scientifically reliable
principles and that the Drive Test data was irrelevant because it was performed
more than nine months after Whitehouse's death. Horan testified at the

hearing, after which the trial court ruled that the jury could conclude that Horan qualified as an expert and the NELOS and Drive Test data were admissible. Horan testified before the jury at length regarding his conclusions based on the NELOS and Drive Test data about the whereabouts of Whitehouse's and Browning's cell phones on the day of her murder, and the maps that he generated based on that data were admitted into evidence.

[11] Browning testified on his own behalf and told the jury that he had sold Whitehouse cocaine at the Kingsley Avenue home around 4:00 a.m. on November 2, 2016, and that he finished dealing that morning around 8:00 a.m. and went home. Browning denied ever being at Whitehouse's home or being in her car. Browning also denied knowing Porter or telling him about the details of his case. The jury found Browning guilty as charged.

[12] On October 2, 2019, the trial court held Browning's sentencing hearing. Due to double jeopardy concerns, the trial court did not sentence Browning for felony murder. Browning argued that his robbery conviction should be reduced to a Level 5 felony because the injury had been taken away from the robbery Count. The State countered that the trial court could sentence Browning for the robbery as a Level 3 felony because, while the jury had not been instructed on the use of a deadly weapon as an enhancement for the robbery, the State had alleged in the Information that Browning was armed with a deadly weapon and the jury had been provided with the Information in its instructions. The trial court accepted the State's argument and reduced the Level 2 felony robbery conviction to a Level 3 felony. The trial court sentenced Browning to sixty-five

years for murder and to sixteen years for robbery, to be served consecutively, for an aggregate sentence of eighty-one years.

[13] Browning now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Robbery*

[14] The jury found Browning guilty of Level 2 felony robbery, and after hearing the arguments of the parties, the trial court entered judgment of conviction on the robbery as a Level 3 felony instead of a Level 5 felony, as had been advocated for by Browning. Browning now argues, and the State concedes, that, in light of this court's decision in *Martin v. State*, 134 N.E.3d 1033 (Ind. Ct. App. 2019), Browning's conviction for Level 3 felony robbery must be reduced to a Level 5 felony.

[15] Like Browning, Martin was convicted of murder, felony murder, and Level 2 felony robbery. *Id*. at 1035. Due to double jeopardy concerns, the trial court did not sentence Martin for felony murder, and it reduced the robbery to a Level 3 felony. *Id*. In concluding that Martin's robbery conviction must be further reduced to a Level 5 felony, we observed that a Level 2 felony occurs if a robbery results in serious bodily injury to a person other than the defendant; a Level 3 felony occurs if the robbery results in bodily injury or is committed while armed with a deadly weapon; and that a Level 5 felony robbery occurs when a person knowingly or intentionally takes property from a person by using or threatening to use force or by putting any person in fear. *Id*. at 1036 (citing

I.C. § 35-42-5-1(a)). In Martin's case, the State had not alleged that he had been armed with a deadly weapon when he committed the robbery, and the jury was not so instructed. *Id.* Therefore, we concluded that Martin had been sentenced for a crime, Level 3 felony robbery, for which he had not been convicted by a jury, which was fundamental error. *Id.* at 1037. We vacated Martin's sentence for Level 3 felony robbery and remanded for entry of judgment of conviction and sentencing for Level 5 felony robbery. *Id.*

[16] Here, although the State alleged in the Information that Browning had been armed with a deadly weapon while he committed the robbery, the jury was not specifically instructed on the use of a deadly weapon to enhance the robbery charge. In light of *Martin* and given the State's concession, we vacate Browning's conviction for Level 3 felony robbery and remand for entry of judgment of conviction and sentencing for Level 5 felony robbery. *See id.*

## II. *Judicial Impartiality*

[17] Browning contends that he was deprived of a fair trial because the trial court judge exhibited bias against him. "A trial before an impartial judge is an essential element of due process." *Everling v. State*, 929 N.E.2d 1281, 1287 (Ind. 2010). A trial court judge is presumed to be unbiased. *Smith v. State*, 770 N.E.2d 818, 823 (Ind. 2002). "[T]o rebut that presumption, a defendant must establish from the judge's conduct actual bias or prejudice that places the defendant in jeopardy." *Id.* A defendant makes this showing "only where there is an undisputed claim or where the judge expressed an opinion of the controversy over which the judge was presiding." *Id.* A defendant cannot

make the requisite showing of bias merely by making that assertion. *Id.* In assessing whether a judge has exhibited partiality, we examine both the judge's actions and demeanor. *Tharpe v. State*, 955 N.E.2d 836, 839 (Ind. Ct. App. 2011), *trans. denied.* Browning argues that the trial court exhibited bias against him through a "pattern of rulings, interruptions of defense counsel, and comments before the jury[.]" (Appellant's Br. p. 18).

### i. Adverse Rulings

[18] Browning directs our attention to what he claims was a pattern of adverse rulings that demonstrated bias on the part of the trial court. More specifically, Browning claims that the trial court overruled all but one of his evidentiary objections, uniformly sustained the State's objections, and ruled against him on the issue of whether judgment should be entered against him for Level 3 or Level 5 felony robbery. However, Browning's argument regarding the trial court's evidentiary rulings is at least partially inaccurate, as the trial court sustained Browning's objections to speculation twice during Porter's testimony and once to the State's leading of the same witness. More importantly, "[t]he mere assertion that certain adverse rulings by a judge constitute bias and prejudice does not establish the requisite showing." *Voss v. State*, 856 N.E.2d 1211, 1217 (Ind. 2006). Browning merely asserts that the number of adverse evidentiary rulings constituted bias; he does not attempt to show that any of the trial court's evidentiary rulings were contrary to law or the Rules of Evidence. Thus, Browning has failed to meet his burden to establish bias. *Id.*

[19]     We reach a similar conclusion regarding Browning's claim based on the trial court's ruling that his robbery conviction should be entered as a Level 3 felony. The facts of *Martin* demonstrate that the issue was not a settled one, as the trial court in *Martin* reached the same conclusion as the trial court in this case. Browning does not argue that the robbery enhancement issue was an "undisputed claim" which would have rendered the trial court's decision against him biased. *See Smith*, 770 N.E.2d at 823. We find no demonstrated actual bias in the trial court's rulings.

### ii. Comments Before the Jury

[20]     Next, Browning argues that certain comments by the trial court demonstrated bias against him, citing an instance wherein the trial court told defense counsel, upon sustaining the State's speculation objection, not to lead the witness and citing a second instance wherein the trial court directed defense counsel not to testify while cross-examining a detective. In his Reply, Browning acknowledges that he mischaracterized the trial court's admonishment not to lead, which was actually directed to the prosecutor. In addition, we cannot conclude that the trial court's comment to defense counsel not to testify through his questions showed actual bias. Early in the trial proceedings during *voir dire*, the trial court told the prospective jurors that

> [o]ne of the things that does not happen in every trial is that the lawyers are extremely talented, right. In this trial, you will have the blessing of really talented attorneys on both sides.

What that means is that they know the rules. They understand how to go forward. You won't see any of the crazy stuff that happens on television. . . They'll do real well. They know what they're doing. And that's something that'll – that you can count on for this trial. It makes my job a lot easier too.

(Tr. Vol. II, p. 19). With its comments to the *venire* panel, the trial court set the tone for the trial, demonstrated that it held counsel for both parties in high regard, and put counsel on notice that it would hold them to high standards. Browning does not assert that his counsel was not testifying through his questions to the detective, and the trial court was simply holding defense counsel to the Rules of Evidence.

[21] Browning further argues that disparate treatment by the trial court when witnesses continued to talk over an objection was a manifestation of its bias against him. During defense counsel's cross-examination of Horan regarding Horan's knowledge of how NELOS data was compiled, the following exchange took place:

> Horan: I know how it works. I just don't know which technology they used for that specific NELOS hit.
>
> Defense counsel: So, well, that's not exactly accurate. You said you're assuming that they use a couple of different technologies to generate their information; is that more accurate?
>
> Prosecutor: Objection. That's actually mischaracterization of his testimony. He said he knows they used two.
>
> Horan: There's two.

> Trial court: Okay. I'm going to sustain that objection, that it does misstate, and you want to rephrase?

(Tr. Vol. V, p. 29). During the State's cross-examination of Browning, the following occurred:

> Prosecutor: Right. So do you – Mr. Browning, the stipulation says the phone was in your exclusive possession the entire time.
>
> Browning: So how would we know it was in my exclusive possession –
>
> Prosecutor: You would know that because you signed it.
>
> Browning: I signed to it being by phone.
>
> Defense counsel: Objection. Argumentative and – argumentative and –
>
> Browning: I'm sorry about that, jury.
>
> Trial court: Stop talking.

(Tr. Vol. V, p. 123-24). Browning argues that the fact that the trial court did not admonish Horan to stop talking but did admonish him demonstrated bias. However, it was within the discretion afforded a trial court in conducting a trial to protect Browning's rights to a fair trial and to freedom from self-incrimination by insisting that Browning refrain from directly addressing the jury and talking when a question was not before him, interests that were not similarly implicated by Horan's conduct. A trial court's disparate actions in the face of disparate circumstances does not amount to bias. Therefore, we find no actual bias inherent in the trial court's admonishment to Browning.

*iii. Sidebars*

[22] Browning also cites three instances of the trial court calling sidebars during his counsel's questioning of witnesses as manifesting actual bias against him: (1) when the trial court was concerned that defense counsel's inquiries into the prosecutor's mental state in making the charging decision would create a conflict of interest by requiring the prosecutor to testify; (2) when the trial court called the parties to the bench to clarify for itself whether Whitehouse had made three or four calls to Browning; and (3) when defense counsel did not readily comply with the judge's admonishment during cross-examination not to interrupt Horan while he was attempting to answer defense counsel's questions. Browning argues that these cited instances of trial court conduct "likely gave the jury an unfavorable impression of the defense and suggested [defense counsel] was a less than competent attorney." (Appellant's Br. pp. 21-22) (quotations omitted).

[23] In addressing this argument, we find it significant that when the trial court called the parties to the bench to address defense counsel's questions about the prosecutor's charging decision, she simply asked, "Could I see the parties at the bench?" (Tr. Vol. IV, p. 95). The trial court did not provide any reason for its request. The trial court had given the jury a preliminary instruction that the trial court would be required to make rulings during trial and that "[n]othing I sa[y] or do is intended to recommend what facts or what verdict you should find." (Tr. Vol. II, p. 126). Thus, the jury was put on notice that the trial court was required to make rulings during the trial, and, given that it provided no

reason for convening the sidebar, there was nothing from which the jury could have made a negative inference about the defense or defense counsel.

[24] We reach a similar conclusion regarding the second sidebar cited by Browning. When calling the parties to the bench during the questioning about the number of calls made by Whitehouse to Browning, the trial court asked defense counsel and the prosecutor, "Can I see the parties at the bench just for a clarification just for myself?" (Tr. Vol. IV, pp. 111-12). The trial court's announcement that it personally required a clarification, the nature of which was not disclosed to the jury and which only happened once during a four-day trial, did not demonstrate prejudice against Browning or provide anything from which the jury could have inferred that the trial court held a negative opinion of the defense.

[25] The final sidebar to which Browning directs us occurred during defense counsel's lengthy cross-examination of Horan about whether NELOS data was subject to peer review. The judge admonished defense counsel three times to allow Horan to answer the question posed without interruption. When defense counsel felt that Horan had not answered the question asked, the following exchange occurred:

> Defense counsel: That's – again, that's not the question I asked you. I know what you're trying to do and I think the jury knows what you're trying to do, but again, the –
>
> Prosecutor: [O]bjection.
>
> Trial court: Sustained.

Defense counsel: The –

Trial court:  Please confine it to a question, not you comment on—

Defense counsel:  I have but he won't answer it.

Trial court:  Please approach.

(Tr. Vol. V, pp. 24-25).  At the sidebar, the trial court told defense counsel that he was alienating the jury by arguing and that the court expected him to abide by its evidentiary rulings.  Our supreme court has held that "[e]ven where the court's remarks display a degree of impatience, if in the context of a particular trial they do not impart an appearance of partiality, they may be permissible to promote an orderly progression of events at trial." *Everling*, 929 N.E.2d at 1288.  Browning does not attempt to argue that defense counsel's comment on the jury's thought process, interruption of the trial court's evidentiary ruling, and argumentative comment to the trial court were proper.  Indeed, we interpret the trial court judge's convening of a sidebar and remarks to defense counsel as reinforcing its authority to direct the flow of evidence and promote the orderly flow of the trial in the face of defense counsel's conduct.  *See id*. Because Browning has failed to establish any actual bias or prejudice flowing from the manner in which the trial court conducted his trial, we conclude that Browning has failed to overcome the presumption that the trial court was impartial.  *See Smith*, 770 N.E.2d at 823.

## III. *Cell Phone Location Evidence*

### A. *Standard of Review*

Browning contends that the trial court abused its discretion when it admitted the NELOS and Driving Test evidence. "We review evidentiary rulings for abuse of discretion resulting in prejudicial error." *Williams v. State*, 43 N.E.3d 578, 581 (Ind. 2015). An abuse of a trial court's discretion occurs when its ruling is clearly against the logic and effect of the facts and circumstances before it. *Id.*

### B. *NELOS*

In challenging the admission of the NELOS evidence, Browning does not argue that Horan was unqualified to provide expert testimony. Rather, he contends that the trial court abused its discretion when it admitted the NELOS evidence because the State did not show that the data was based on scientifically reliable principles. Indiana Evidence Rule 702(b) provides that "[e]xpert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles." There is no specific test or set of factors to be met to establish scientific reliability. *Doolin v. State*, 970 N.E.2d 785, 787 (Ind. Ct. App. 2012), *trans. denied*. When laying the foundation for the admission of scientific evidence, the focus must be on principles and methodology behind the science, not on the conclusions generated. *West v. State*, 805 N.E.2d 909, 913 (Ind. Ct. App. 2004), *trans. denied*. Scientific reliability may be established by "sufficient foundation to convince the trial court that the relevant scientific principles are reliable." *Sciaraffa v. State*, 28

N.E.3d 351, 357 (Ind. Ct. App. 2015), *trans. denied*. Rule 702(b) "directs the trial court to consider the underlying reliability of the general principles involved in the subject matter of the testimony, but it does not require the trial court to re-evaluate and micromanage each subsidiary element of an expert's testimony within the subject." *Sears Roebuck & Co. v. Manuilov*, 742 N.E.2d 453, 461 (Ind. 2001). While the party offering the evidence at trial bears the burden of persuading the trial court that the evidence is admissible, we presume that the trial court's decision is correct, and the burden is on the party challenging the trial court's decision to persuade us that the trial court has abused its discretion. *Bennett v. Richmond*, 960 N.E.2d 782, 786 (Ind. 2012).

[28] At the hearing on the admissibility of the cell phone data held outside of the presence of the jury, Horan testified to the following facts regarding the reliability of NELOS data. NELOS data is developed by AT&T to optimize cell phone service for its customers, and NELOS data is routinely requested by law enforcement officials along with standard cell phone records because NELOS is the best cell phone location data available. Horan had processed NELOS data on hundreds of occasions and found it to be reliable because "we've actually found people in these circles. We've actually found evidence in these circles." (Tr. Vol. IV, p. 197). All cell phone service providers develop similar data, although they use different names for it. NELOS data and its equivalent from other service providers are developed based on either roundtrip delay or triangulation. Roundtrip delay is the period of time it takes a cell phone's signal to travel from the cell phone tower to the phone and back.

Triangulation is possible when three cell towers simultaneously send signal to a cell phone. According to Horan, both methods of determining cell phone location and the principles they are based on are "well-known" within the radio frequency community, but, because NELOS data is proprietary, AT&T will not reveal which of the two methods it used to produce specific data. (Tr. Vol. IV, p. 189). The margin of error for NELOS data is included within the data itself through the provision of the range of uncertainty.

[29] Through this testimony, the State established the scientific principles underpinning the creation of NELOS data, the acceptance of those principles within the radio frequency community, and the margin of error for any NELOS data point. While the State could have done more to establish the foundation for this evidence, we conclude that the State made a showing of the reliability of the NELOS data such that the trial court did not abuse its discretion when it ruled that it was admissible. *See*, *e.g.*, *Overstreet v. State*, 783 N.E.2d 1140, 1151 (Ind. 2003) (finding sufficient foundation for the reliability of STR DNA testing where experts testified that the testing was based upon reliable scientific principles, DNA analysts relied on it, and it was a generally accepted technique in the scientific community).

[30] Browning contends that the State did not establish an adequate foundation for the NELOS data because Horan could not specify whether AT&T used the roundtrip or triangulation method to produce its data. We observe that Horan does not argue that the State failed to establish the reliability of the scientific principles themselves. Furthermore, because the State established the reliability

of both principles, the fact that Horan could not specify which principle was used did not undercut the scientific reliability of the data. We are also unpersuaded by Browning's argument that the State's evidentiary foundation was inadequate because the NELOS data "appears not to have been peer-reviewed by anyone outside of AT&T." (Appellant's Br. p. 24). Peer review is a pertinent consideration for *Daubert* analysis pursuant to Federal Rule of Evidence 702. *Daubert v. Merrell Dow Pharm.*, Inc., 509 U.S. 579, 593, 113 S.Ct. 2786, 2797, 125 L.Ed.2d 469 (1993). However, *Daubert* is merely instructive in Indiana, and, therefore, it is not dispositive of scientific reliability that the challenged evidence has not been subject to peer review. *Turner v. State*, 953 N.E.2d 1039, 1051 (Ind. 2011). As these are the only arguments against admissibility of the NELOS data made by Browning to us, we conclude that he has not met his appellate burden to overcome the presumption of the correctness of the trial court's evidentiary ruling. *See Bennett*, 960 N.E.2d at 786. Due to our resolution of this issue, in the interests of judicial economy, we do not address the State's argument that Horan's testimony was "specialized knowledge" not subject to the strictures of Rule 702(b).

### C. *Drive Test*

Horan performed the Drive Test on August 15, 2017, more than nine months after Whitehouse was killed. At the hearing on the admissibility of the cell phone location data, Browning developed evidence through Horan that the Drive Test generates a "snapshot" of cell phone signal reach and that many factors can affect signal on a given day such as terrain, the foliage present at

different times of year, and buildings. (Tr. Vol. IV, p. 179). Horan acknowledged that a drive test done on November 2, 2016, and one done on August 15, 2017, would not be a "one-to-one comparison," and that the mapping could be off by as much as one city block. (Tr. Vol. IV, p. 185).

[32] Browning argues that in light of such factors as differing amounts of foliage and "the construction or removal of a building," the trial court abused its discretion in admitting the Drive Test evidence generated on August 15, 2017, because it was irrelevant. (Appellant's Br. p. 26). Relevant evidence is that which "has any tendency to make a fact more or less probable than it would be without the evidence." Ind. Evidence Rule 401. Irrelevant evidence is not admissible. Evid. R. 402. The State sought the admission of the Drive Test evidence to show that Whitehouse's and Browning's cell phones were in proximity to each other on November 2, 2016, making it more probable that Browning was the one who killed her. The identity of Whitehouse's killer was the primary issue at trial, so we conclude that this evidence was relevant, and, therefore, admissible.

[33] Browning does not contend that Horan was not qualified to testify about the Drive Test, nor does he argue that the Drive Test itself was not based on reliable scientific principles. If expert testimony is admissible, "then the accuracy, consistency, and credibility of the expert's opinions may be properly left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact." *Alcantar v. State*, 70 N.E.3d 353, 357 (Ind. Ct. App. 2016). Browning's counsel subjected Horan to vigorous cross-examination and argued in closing statements that Horan's "entire report

is based on junk science" that was unreliable due to the passage of time and differing conditions. (Tr. Vol. V, p. 177). It was the jury's province to weigh this evidence in light of any changed conditions that may have affected the accuracy of the results. *See id*. Accordingly, we conclude that the trial court did not abuse its discretion in admitting the Drive Test evidence over Browning's relevancy objection.

### D. *Harmless Error*

[34] Even if the trial court had abused its discretion in admitting the NELOS and Drive Test evidence, it would not require reversal unless Browning's substantial rights were prejudiced. *Williams*, 43 N.E.3d at 583. In assessing whether an evidentiary error prejudiced a defendant's substantial rights, we consider the probable impact of the evidence on the jury in light of all the other properly-presented evidence. *Id*. "If we are satisfied the conviction is supported by independent evidence of guilt, the error is harmless." *Id*. In other words, we assess whether the jury's verdict was substantially swayed. *Lafayette v. State*, 917 N.E.2d 660, 666 (Ind. 2009). "If the error had substantial influence, or if one is left in grave doubt, the conviction cannot stand." *Id*.

[35] In assessing the probable impact of this evidence on the jury, we begin by noting that on the cell phone location maps admitted at trial, the NELOS range of uncertainty circles were almost entirely contained within the footprints generated by the Drive Test such that the Drive Test data did not have a great deal of persuasive value in this case. We also note that Browning vigorously cross-examined Horan before the jury about the reliability of the NELOS and

Drive Test data and maligned it as "junk science" during closing arguments, so the jury was fully apprised of Browning's opinion of the reliability of that evidence. (Tr. Vol. V, p. 177).

[36] In addition, substantial independent evidence supported Browning's convictions. Porter testified that Browning told him that he had killed Whitehouse and taken her property because she owed him money for drugs. This was direct evidence of Browning's guilt that could have sustained the jury's verdict standing alone. *See Sallee v. State*, 51 N.E.3d 130, 134-35 (Ind. 2016) (noting that a murder conviction can be sustained on the testimony of a single witness, even where the evidence is uncorroborated, and upholding Sallee's murder convictions where a cellmate testified that Sallee confessed to him). The State buttressed its case with evidence that on November 2, 2016, around 5:00 p.m. when Whitehouse was already dead, her car was seen parked outside the passthrough between Browning's apartment complex and Hillside Avenue. Whitehouse's credit and health insurance cards were also found in the same location. The fact that Whitehouse's property was found so close to Browning's home further linked him to the offenses. The State also presented evidence from which the jury could infer that a struggle took place in Whitehouse's home, Browning's DNA was under Whitehouse's fingernails, and her phone and purse had been taken.

[37] We agree with Browning that the State relied upon the challenged evidence in its closing argument to the jury. We also observe that the jury did not have the cell phone location maps during its almost five hours of deliberation, but that a

short time after the trial court sent the maps back to the deliberation room along with all the other exhibits, the jury reached its verdict. However, given the scant persuasive value of the Drive Test data, Browning's cross-examination and arguments to the jury, and the other substantial, independently-admitted evidence of Browning's guilt, we are not convinced that Browning's substantial rights were prejudiced by the admission of the NELOS and Drive Test data such that reversal of the jury's verdict is required. *See Williams*, 43 N.E.3d at 583.

## CONCLUSION

[38] Based on the foregoing, we conclude that Browning's Level 3 felony robbery conviction must be vacated, and we remand for entry of judgment of conviction and resentencing for Level 5 felony robbery. We further conclude that Browning has failed to establish that the trial court was biased against him or that the trial court abused its discretion in admitting the NELOS and Drive Test evidence.

[39] Affirmed in part, vacated in part, and remanded for proceedings consistent with this opinion.

[40] May, J. and Altice, J. concur