## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 15 2016, 6:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michelle F. Kraus
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Freddie L. Alcantar, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | November 15, 2016 <br><br> Court of Appeals Case No. 02A03-1512-CR-2284 <br><br> Appeal from the Allen Superior Court. <br> The Honorable John F. Surbeck, Judge. <br> Cause No. 02D06-1401-MR-1 |

**Shepard, Senior Judge**

[1]     Debra Jones was found dead in her home.  DNA evidence, along with Freddie Alcantar's jail-house confession, implicated him in the crime.  Alcantar was charged, tried, and convicted of Debra's murder.  He appeals, arguing discovery violations and erroneous admission of evidence.  We affirm.

# Facts and Procedural History

[2] Alcantar and Erika were married. At the time of the murder, Alcantar was unemployed. Erika's mother Debra Jones financially supported the couple. Six months prior to her murder, she banned Alcantar from entering her home because "he was still not working [or] helping out." Tr. p. 130.

[3] On August 29, 2013, the day before she was murdered, Ms. Jones met with Alcantar and Erika and gave them $450 to pay their rent. She also provided Erika with a key to her house because she planned to go out of town with her sister Pam the next day and needed Erika to look after her dog. Erika attached the house key to a key ring that contained the key to the car she and Alcantar shared.

[4] After receiving the money and the key, Alcantar and Erika returned to their home, and later argued. The two had filed for divorce in May 2012. That petition was dismissed and the couple continued to live together, but their marriage "was not working out." *Id*. at 110.

[5] Erika called her mother around 9:30 p.m. and told her she was leaving Alcantar, "that [she] was ready just to move back home." *Id*. at 109. Erika began to pack her belongings, but did not leave the residence. Her mother told her to calm down and go to bed, and that they would talk about the situation when she returned from her trip. Alcantar heard Erika talking to her mother.

Erika went to bed. Awaking at 2:30 a.m., she noticed Alcantar was no longer at home. She called his cell. When he answered, he was at a gas station located halfway between their house and Debra's. Erika went back to sleep. When she awoke at 4 a.m. to get ready for work, Alcantar had returned home.

Alcantar drove Erika to work around 5 a.m. on August 30, 2013. At 10 a.m., he picked her up and drove her to a doctor's appointment. While driving to the doctor, Erika noticed Alcantar's hand had deep cuts. He said the cuts came from untangling their dogs' chains. However, the cuts appeared to be straight-line cuts and not consistent with cuts from chains.

After the doctor's appointment, Alcantar and Erika returned to their home and prepared lunch. Around that time, Erika's aunt Pam called, looking for Debra Jones, whom she had been trying to reach since 8:30 that morning.

Alcantar and Erika drove to Ms. Jones' house. Erika used her key and entered, while Alcantar remained outside, smoking a cigarette. There were no signs of forced entry. Erika found her mother dead on the bathroom floor. It looked as if the letters "DY" had been written in the blood found on the bathroom vanity, but efforts to determine what was written were inconclusive.

Writ large, the evidence favorable to the verdict established that during the early morning hours of August 30, 2013, Alcantar entered Debra Jones' home and stabbed her as she lay sleeping in her bed. She fought Alcantar, sustained defensive wounds, and attempted to lock herself in the bathroom. Alcantar kicked in the bathroom door. Ms. Jones sustained multiple stab wounds to her

face, neck, and arms.  Two extensive stab wounds to her neck caused her to bleed to death.  Alcantar was charged with murder, a felony.[1]

[11]     DNA swabs were taken from blood stains found in front of the sink in Debra's kitchen, on a light switch located in the office, and on the bathroom doorframe. First tested in January 2014, the swabs indicated the stains contained DNA profiles from two people.  Alcantar's profile was found to be a major contributor to the stain found in the kitchen.  Debra was the major contributor to the other two stains.  No conclusions were reached about the minor contributors of the DNA found in the stains because the statistical calculations then used by the Indiana State Police (ISP) did not allow for such conclusions.

[12]     In November 2014, the ISP adopted a new algebraic formula that allowed statistical calculations to be run on minor DNA profiles.  The formula is called "2p."  When the 2p formula was applied to the minor DNA profiles in this case, Debra Jones was found to be the minor contributor to the stain found at the kitchen sink, and Alcantar's DNA was found to be the minor contributor to the other two stains.

[13]     In a pretrial motion in limine, Alcantar challenged use of the 2p formula.  At a hearing on the motion, defense counsel argued that the 2p formula was based on unreliable scientific principles, and that the DNA results obtained by using the formula should not be admitted into evidence.  The trial court denied the

---

[1] Ind. Code § 35-42-1-1 (2007).

motion, finding that the "science of DNA analysis and specifically the '2p formula' for the identification of individuals in a mixture calculation is sufficiently advanced such that it is appropriate to admit the evidence . . . subject to thorough cross examination [sic] and contrary opinions from qualified experts." Appellant's App. p. 88.

[14] While Alcantar was awaiting trial, he spoke with fellow inmate Travis Gipson and asked if his attorney was competent. The conversation turned to Debra's murder and Alcantar told Gipson, "I did it." Tr. p. 296. "I stabbed her." *Id*. Alcantar continued, stating he wished he had not told police he cut his hand on the dogs' chains, that he was concerned whether the police could track his Boost Mobile phone, and that he was worried he might have left a footprint in Debra's bathroom. Gipson relayed this information to a police detective. The information Alcantar told the inmate had not been released to the public.

[15] During trial, Gipson testified about his conversation with Alcantar. On cross-examination, which occurred on the second day of trial, Gipson denied having talked to two police detectives about the conversation prior to speaking with a third detective. That evening, the prosecutors learned that Gipson in fact had participated in a prior recorded interview, and had discussed his conversation with Alcantar with the two detectives. Defense counsel was notified immediately and provided with a copy of the recorded interview. It appears that Gipson's prior interview with the two detectives had been disclosed to the defense. What was not disclosed was the fact that the prior interview was recorded. *Id*. at 349-50.

[16]	The next morning, on the third day of trial, defense counsel moved to dismiss, based on the late disclosure of the recorded interview. The court denied the motion because the prosecution did not deliberately withhold the information. The court then offered to continue the trial if defense counsel so desired. Counsel acknowledged that she might be waiving the issue by not asking for, or by declining, the continuance. Nevertheless, counsel declined the offer, stating that "in a situation like this where we're mid trial [sic] and it's already happened, the continuance is ineffective . . . so I don't want the continuance. Because quite frankly I think the case is going well for us . . . ." *Id.* at 355. Counsel indicated that she needed just thirty minutes to instruct her investigator, and that she would then "just recall Mr. Gipson . . . ." *Id.* at 358. Counsel later cross-examined Gipson on his previous testimony.

[17]	The jury found Alcantar guilty as charged. The court sentenced him to sixty-five years.

# Issues

[18]	Alcantar presents two issues:

> I.	Whether the trial court erred when it denied his motion to dismiss for a discovery violation; and
>
> II.	Whether the trial court erred when it admitted the 2p DNA evidence.

# Discussion and Decision

## *I. Discovery Violation*

[19] Alcantar first contends that the trial court erred when it did not dismiss his case on grounds the State failed to timely produce Gipson's recorded interview. He contends the discovery violation violated his due process rights and his Sixth Amendment right to effective assistance of counsel, and substantially prejudiced him. Alcantar does not develop these arguments. The State argues that Alcantar waived any claim of error because he did not request a continuance.

[20] Trial courts have broad discretion in dealing with discovery violations by the State in the alleged late disclosure of evidence to the defense. *See Berry v. State,* 715 N.E.2d 864 (Ind. 1999). We may reverse the manner in which the trial court deals with such an alleged violation only for an abuse of that discretion involving clear error and resulting prejudice. *Id.*

[21] "Generally, the proper remedy for a discovery violation is a continuance." *Id.* If a continuance would have cured the harm that arose by the discovery violation, failure to request one results in waiver. *See Fleming v. State,* 833 N.E.2d 84 (Ind. Ct. App. 2005). Because Alcantar's counsel did not request a continuance (apparently for reasons of trial strategy) and declined the continuance offered by the trial court (under circumstances where a

continuance would have been useful), we find Alcantar has waived appellate review of this issue.[2]

## II. DNA Evidence

[22] Alcantar next argues that the trial court erred when it admitted the minor-profile DNA results that were calculated using the 2p formula. He says the State failed to establish the scientific reliability of the expert testimony on the use of the 2p formula. As such, the State's experts should not have been allowed to testify to the minor-profile DNA evidence.

[23] In support of his argument, Alcantar points to the following: the State did not present any ISP standard operating procedures for DNA test methods; the State's expert witnesses could identify only two labs that used the 2p formula; the ISP's technical operations leader could not specifically name any peer-review articles he had read on the 2p formula; and Alcantar's expert witness indicated that the analysis of DNA mixtures is controversial, that the formula has not gained general acceptance in the forensic community, that the formula has not been empirically tested, and that he knew of no labs that used the 2p formula as ISP uses it.

---

[2] In his brief, Alcantar alleges the State committed another discovery violation when a State expert witness testified differently at trial than at a prior evidentiary hearing. Appellant's Br. pp. 20-21. Alcantar's counsel requested a sidebar and indicated that she was not prepared to cross-examine the witness on the changed testimony, but counsel did not request a continuance. As such, this issue also is waived.

We review a trial court's evidentiary decisions for an abuse of discretion. *Smith v. State,* 702 N.E.2d 668 (Ind. 1998).

The phrase "DNA test results" is not a magic one that "'once uttered, cause[s] the doors of admissibility to open.'" *Smith,* 702 N.E.2d at 672. Rather, and notwithstanding Indiana Code Section 35-37-4-13(b),[3] DNA evidence presented by expert testimony must satisfy the requirements of the Indiana Rules of Evidence, including Rule 702, which says:

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
>
> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

Rule 702 is "not intend[ed] to interpose an unnecessarily burdensome procedure or methodology for trial courts." *Sears Roebuck and Co. v. Manuilov*, 742 N.E.2d 453, 460 (Ind. 2001). Once the trial court is satisfied that the expert's testimony will assist the trier of fact and that the expert's general methodology is based on reliable scientific principles, then the accuracy, consistency, and credibility of the expert's opinions may properly be left to

---

[3] Indiana Code section 35-37-4-13(b) states, "In a criminal trial or hearing, the results of forensic DNA analysis are admissible in evidence without antecedent expert testimony that forensic DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material."

vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact. *Id*. at 461.

[27] Serafina Salamo, an ISP forensic DNA analyst, and Carl Sobieralski, the ISP technical operations leader, both testified for the State regarding the 2p formula. Dr. Karl Reich, Alcantar's expert on forensic DNA, also testified. Reich's ultimate concern with the 2p formula was that an individual who is not familiar with statistics in general or how partial DNA profiles might be statistically calculated might have difficulty interpreting the 2p calculation. He testified that the 2p formula, in his opinion, was a "statistically neutral approach" that it is just one of the possible statistical calculations that can be used, but that it is "too hard to understand." Tr. pp. 586-87. He further testified that the 2p formula was not based on reliable scientific principles because the methodology had not gained acceptance in the scientific community. Reich was not certain how many laboratories used the 2p formula the way the ISP lab uses it, but later testified that the 2p formula was used in the Illinois State Police laboratory.

[28] On the other hand, Salamo, Sobieralski, and also Reich all provided testimony that the 2p formula is not new. Salamo testified that the formula was adopted for use in forensic science around 1996. According to Sobieralski, the 1996 National Research Council-II Report (NRC-II) listed 2p as one of the several

calculations found to be useful in the field of forensic DNA.[4]  He testified that 2p was endorsed by the 2010 guidelines issued by the Scientific Working Group on DNA Analysis and Methods (SWGDAM), an oversight group for forensic DNA established to develop industry "best practices."  Sobieralski testified that he believed the 2p formula was accepted in the scientific community because it was recommended by SWGDAM and endorsed by the NRC-II.  He provided testimony indicating that several labs used the formula.

[29]  The State presented a copious amount of evidence indicating the 2p formula is based on reliable scientific principles.  Alcantar vigorously cross-examined the State's witnesses and presented his own expert, who expressed his contrary opinion.  There is no specific "'test' or set of 'prongs' which must be considered in order to satisfy Indiana Evidence Rule 702(b)."  *McGrew v. State*, 682 N.E.2d 1289, 1292 (Ind. 1997).  We conclude the dispute over the 2p formula in this case goes to the weight attributed to the formula and the conclusions reached by applying the calculations to the minor DNA profiles, and not to the admissibility of testimony regarding the formula.  The trial court did not abuse its discretion in admitting expert testimony, based on Rule 702, on the use of the 2p formula to calculate minor-profile DNA.

---

[4] The National Research Council Report-II, and its predecessor the National Research Council Report-I, contain DNA testing guidance and recommendations provided by representatives from the legal community and forensic scientists and academicians.  Evid. Hearing pp. 109-110.

# Conclusion

[30] For the foregoing reasons, we affirm the judgment of the trial court.

[31] Affirmed.

May, J., and Bradford, J., concur.