

IN THE

# Court of Appeals of Indiana

Gbenga Afolabi,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*



FILED

Apr 15 2026, 8:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

---

April 15, 2026

Court of Appeals Case No.
24A-CR-3081

Appeal from the Marion Superior Court

The Honorable Angela Dow Davis, Judge

Trial Court Cause No.
49D27-2111-F5-35434

---

**Opinion by Judge Weissmann**
Judges Bradford and DeBoer concur.

**Weissmann, Judge.**

[1] Gbenga Afolabi was working as a prison guard at the Indiana Women's Prison when he was accused of forcing multiple inmates to engage in sexual conduct with him. After a jury trial, Afolabi was convicted of two counts of rape, one count of attempted rape, five counts of sexual misconduct, three counts of official misconduct, and two counts of intimidation. Afolabi appeals these convictions, arguing that the trial court abused its discretion in making certain procedural and evidentiary decisions. He also challenges the sufficiency of the evidence to support one of his rape convictions and claims some of his other convictions violate the prohibition against substantive double jeopardy.

[2] One of these arguments prevails but only in part. Applying the three-step substantive double jeopardy analysis that our Supreme Court enunciated in *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020), we find Afolabi's dual convictions for the rape and intimidation of one of his victims gives rise to a presumption of double jeopardy that the State fails to rebut. We therefore remand for the trial court to vacate Afolabi's intimidation conviction as to that victim and its corresponding current sentence. We otherwise affirm.

## Facts

[3] In 2021, Afolabi was employed as a correctional officer with the Indiana Department of Correction, working night shifts at the Indiana Women's Prison (IWP). During the spring and summer of 2021, three IWP inmates—identified

as J.M., M.A., and L.B.—alleged that Afolabi forced them to engage in sexual conduct with him while he was acting in his official capacity as a correctional officer.[1]

[4] The first inmate, M.A., arrived at IWP in March 2021. M.A. was housed on a unit where Afolabi worked, and Afolabi soon began making "flirty to sexual comments" to M.A. about her hair, buttocks, and breasts. Tr. Vol. III, p. 160. Not long thereafter, Afolabi started asking to see various parts of M.A.'s body, including her genitals. M.A. initially "laughed it off and didn't think [Afolabi] was serious." *Id.* at 162. But Afolabi began issuing M.A. disciplinary reports that she believed could impact her release date. M.A. therefore began complying with his requests to see parts of her body.

[5] In early May 2021, Afolabi requested that M.A. perform oral sex on him. M.A. refused, after which Afolabi issued her a disciplinary report for trafficking bubblegum. When he informed M.A. of the report, Afolabi said to her, "I thought you [would] do anything to go home. I'm giving you a choice now." *Id.* at 167. Afolabi then left M.A.'s cell. More than 90 minutes later, Afolabi returned and directed M.A. to stand up, turn around, drop her pants, and bend over. After M.A. complied, Afolabi unzipped his pants and attempted to insert his penis into M.A.'s vagina but was unable to do so. Afolabi then "shoved

---

[1] A fourth inmate also alleged similar sexual misconduct, but all criminal charges related to her were dismissed due to her failure to appear for depositions and at trial.

[M.A.] to the ground" and directed her to "suck his d**k." *Id.* at 169. M.A. again complied, and Afolabi ejaculated in her mouth.

[6] A few weeks later, Afolabi returned to M.A.'s cell and again directed M.A. to stand up, turn around, drop her pants, and bend over. After M.A. complied, Afolabi unzipped his pants and attempted to have sexual intercourse with her. But once again, he was unable to insert his penis into M.A.'s vagina. When M.A. laughed at Afolabi's failure, he retaliated by pinching M.A.'s clitoris, causing her great pain. Afolabi then shoved M.A. to the ground and told her to "suck his d**k" again. *Id.* at 171. M.A. complied, and Afolabi ejaculated in her mouth.

[7] This time, M.A. secretly spit Afolabi's ejaculate into a plastic bag. She hid the bag inside a sock and eventually turned it over to investigators. A DNA analyst (Analyst 1) later tested a sample extracted from M.A.'s plastic bag and identified the presence of Afolabi's DNA therein. Investigators also reviewed footage from IWP's surveillance cameras, which showed Afolabi lingering outside M.A.'s cell on multiple occasions and sometimes stepping briefly out of view. No video footage captured Afolabi's sexual activity with M.A., however.

[8] The second inmate, L.B., entered IWP in 2014. L.B. worked on a night cleaning crew, and Afolabi sometimes made comments to her that she found uncomfortable. After midnight one night, while L.B. was working, Afolabi "cornered" her in a mop closet that was outside the view of the prison's

surveillance cameras. *Id.* at 120. Inside the closet, Afolabi grabbed the back of L.B.'s head and "made [her] kiss him." Tr. Vol. III, p. 124. Afolabi then instructed L.B. to remain in the closet while he briefly left. L.B. "didn't know what to do at that point" and "really didn't think [she] had any choice in anything." *Id.* at 121, 124.

[9]     When Afolabi returned to the closet a few minutes later, he directed L.B. to "suck his d**k." *Id.* at 121. A "scared" L.B. squatted down, and Afolabi grabbed her by the neck and pushed her head toward his penis. *Id.* at 127. L.B. put her mouth on Afolabi's penis but not for very long because he soon told L.B. to stand up, turn around, and pull down her pants. L.B. complied, after which Afolabi inserted his penis into her vagina and ejaculated. L.B. never verbally consented to the sexual acts and felt unable to leave the situation. After these encounters, L.B. was placed on suicide watch. She also cut off her hair to avoid male attention.

[10]    The third inmate, J.M., arrived at IWP in May 2021. On J.M.'s first night in the prison, Afolabi appeared at her cell and rubbed his hand down the front part of her body. Afolabi then put his hand down J.M.'s pants and "basically said that he was the officer and [she] was the inmate and [she] needed to listen to what he says." *Id.* at 145. A month later, Afolabi entered J.M.'s cell and put his hand down her pants again before removing it, placing it in his mouth, and telling J.M. that she "taste[d] good." *Id.* at 248. Afolabi then told J.M. to come with him to the staff bathroom. When J.M. refused, Afolabi mentioned her

family and his authority as a corrections officer. He then pulled on J.M.'s arm, indicating it was time to go. A scared J.M. complied.

[11] Afolabi followed J.M. into the staff bathroom, pushed her against the wall, and told her to kneel. He then grabbed the back of J.M.'s neck and placed his penis in her mouth. Moments later, Afolabi made J.M. stand up and turn around. He inserted his penis into J.M.'s vagina but eventually pulled it out and ejaculated on the bathroom sink. Next, Afolabi directed J.M. to wipe herself, after which he disposed of the wipe in the toilet.

[12] A similar incident occurred in the staff bathroom the following week, but this time, Afolabi ejaculated inside J.M.'s vagina. Immediately after this incident, J.M. called her mother. Her mother then contacted prison officials, who began to investigate Afolabi. J.M. underwent a sexual assault examination and reported that Afolabi had raped her in the staff bathroom that morning. The nurse observed signs of bruising in J.M.'s mouth and on her arm and also documented J.M.'s genital pain. Analyst 1 later performed DNA testing on the evidence collected during J.M.'s examination. The results of this testing revealed the presence of Afolabi's DNA on swabs of J.M.'s anus and on J.M.'s underwear.

[13] During the investigation into J.M.'s allegations, prison officials learned that Afolabi had also forced M.A. and L.B. to engage in sexual conduct with him. The State eventually charged Afolabi with three counts of rape, one count of attempted rape, five counts of sexual misconduct by a service provider, three

counts of official misconduct, and three counts of intimidation. Although Afolabi was charged in November 2021, substantial delays in the prosecution pushed his trial date to late October 2024.

[14] In late February 2024, the defense indicated a desire to depose Analyst 1. The defense proposed a date of March 6th, and the State attempted to arrange the deposition. But the State soon learned that Analyst 1 was on medical leave through April 2024. After the State advised the defense of this information, the defense never again contacted the State to arrange Analyst 1's deposition. Instead, when trial was set for July 8, 2024, the defense moved to exclude Analyst 1 as a witness on the grounds that it had not deposed her. The trial court set the motion for hearing at the final pretrial hearing.

[15] The July 2024 trial date was continued to September 3, 2024, due to a medical emergency involving defense counsel. At the final pretrial hearing on August 26, 2024, the trial court denied the defense's motion to exclude Analyst 1 as a witness after the State agreed to make her available for deposition. But a few days later, the State learned that Analyst 1 had died. The parties therefore jointly sought a continuance of the September 3rd trial date, which the trial court granted.

[16] On August 30, 2024, the trial court rescheduled trial for October 29, 2024, and ordered "NO MORE CONTINUANCES." App. Vol. II, p.178 (emphasis in original). In the two months that followed, the court also repeatedly informed the parties that there would be no further continuances. The court emphasized

that the case was three years old and that the deadline for cases originally filed as Level 5 felony prosecutions was three months.[2]

[17] The State thereafter ordered M.A.'s plastic bag and J.M.'s anal swabs and underwear to be retested for DNA. A new analyst (Analyst 2) performed the retest and, on October 18, 2024, provided the State with her report on the results. The State emailed Analyst 2's report to the defense that same day. But at the final pretrial hearing held five days later, the defense revealed it had not yet reviewed the report. The defense further advised that it would not be prepared for trial on October 29th because it had not deposed Analyst 2. The prosecutor indicated her willingness to join in any defense motion for a continuance, in part, because Analyst 2's report had only been available since October 18th, which was 11 days before the trial date.

[18] The prosecutor also noted that the results from Analyst 2's DNA testing were somewhat different from Analyst 1's test results because the sample from M.A.'s plastic bag had been depleted during Analyst 1's testing. Thus, Analyst 2 could not perform a second round of testing on that sample. The prosecutor added, however, that the results of Analyst 2's testing on J.M.'s anal swabs and underwear were not more probative than Analyst 1's test results. The trial court denied a continuance but invited the defense to "go talk to [Analyst 2,] and if

---

[2] When this case opened, the highest level felony charged was a Level 5 felony. The State later amended the information to include several Level 3 felonies.

you can depose [her] between now and Tuesday[,] that's fine by me." Tr. Vol. II, p. 11.

[19] On the night of the first day of trial—October 29, 2024—the State provided the defense with a revised report from Analyst 2. In this report, Analyst 2 opined that Afolabi's DNA was found in sperm on J.M.'s underwear. The next day, Afolabi moved to exclude Analyst 2's revised report based on its late submission and because it differed from the report provided to the defense on October 18th. The State responded by explaining:

> There's not a change. This is a little complicated so, if I could have a chance to walk everyone through it. Nothing has changed in regard to the lab work of what the analyst did, the report was released on the 18th and before this trial started, I had multiple conversations including [defense counsel] on whether he wanted the lab notes. He indicated to me that he did not want the lab notes. He didn't need them; he didn't need to see them. I say that I didn't have them. I said if you want, I can get them for you. [Defense counsel] said, no I don't want those. So, I said okay and I let him know that the analyst when (sic) I met with her on Monday. I asked her, can you look at what the actual numbers are in this case and tell me if you can see if the result is indicative of sperm and she said, yes and she went to her notes and she said it is. It's not something that is required to be on the report but she update[d] the report just so it would be reflected on there for future of (sic) notice, but it is something she would have testified to regardless. If they don't want the new report with today's date on it, that's fine but it is information that they were given ahead of time, and it is not a change.

Tr. Vol. III, pp. 19-20. The court advised the prosecutor that she could only present the jury with Analyst 2's original, unrevised report but could question Analyst 2 about the presence of sperm in the samples she tested.

[20] Analyst 2 later testified without a contemporaneous objection from Afolabi. During her testimony, the State offered her original, unrevised report as well as other exhibits associated with it. Afolabi's counsel indicated he had "no objection" to any of these exhibits. *Id.* at 211. Analyst 2 went on to testify that the DNA profile she found on J.M.'s underwear had two contributors and that it was "at least one trillion times more likely" that J.M. and Afolabi were the contributors than if J.M. and an unknown person were the contributors. *Id.* at 224. According to Analyst 2, this statistic provided "very strong support" that Afolabi's DNA was found on J.M.'s underwear. *Id.* Analyst 2 also testified that the ratio of male DNA to female DNA in the profile "indicate[d] the possible presence of sperm in the samples." *Id.* at 227.

[21] Other witnesses at Afolabi's trial were his three accusers, DOC investigators, and medical personnel. The jury acquitted Afolabi of the rape and intimidation of J.M. but convicted him of the remaining charges, which consisted of the following:

- As to M.A. – one count of Level 3 felony forcible rape, one count of Level 3 felony attempted forcible rape, one count of Level 5 felony sexual misconduct by a service provider, one count of Level 6 felony official misconduct, and one count of Class A misdemeanor intimidation.

- As to L.B. – one count of Level 3 felony forcible rape, two counts of Level 5 felony sexual misconduct by a service provider, one count of Level 6 felony official misconduct, and one count of Class A misdemeanor intimidation.

- As to J.M. – two counts of Level 5 felony sexual misconduct by a service provider and one count of Level 6 felony official misconduct.

The trial court sentenced Afolabi to a total of 50 years in prison, which included one-year concurrent terms for each of his intimidation convictions. Afolabi appeals.

## Discussion and Decision

[22] Afolabi raises several issues on appeal, two of which we consolidate because they are related. First, he claims the trial court erred by denying his request for a continuance to depose Analyst 2 and by allowing Analyst 2 to testify that Afolabi's DNA was found in sperm on J.M.'s underwear. Second, Afolabi challenges the sufficiency of the evidence to support his conviction for the rape of L.B. And finally, he argues that his dual convictions for the intimidation and rape of both L.B. and of M.A. violated the prohibition against double jeopardy.

[23] We find no reversible error in the trial court's procedural and evidentiary decisions involving Analyst 2. We also find sufficient evidence to support Afolabi's conviction for the rape of L.B. Additionally, we find that Afolabi's dual convictions for the rape and intimidation of M.A. did not constitute substantive double jeopardy but that his dual convictions for the rape and

intimidation of L.B. did. We therefore reverse his conviction for the intimidation of L.B. but otherwise affirm.

## I. The Trial Court Did Not Commit Reversible Error in Its Procedural and Evidentiary Decisions

Afolabi contends the trial court did not engage in the proper analysis when denying him a continuance to depose Analyst 2.[3] He also argues that the decision was unfair because the court had earlier granted the State a continuance for similar reasons. Alternatively, Afolabi asserts that the court erred by admitting Analyst 2's testimony about the presence of sperm on J.M.'s underwear.

## A. Denial of Continuance

A trial court generally has discretion to deny a motion for a continuance and that decision will be reversed only for an abuse of that discretion. *Wells v. State*, 848 N.E.2d 1133, 1143 (Ind. Ct. App. 2006), *corrected on reh'g*, 853 N.E.2d 143 (August 24, 2006), *trans. denied.* "An abuse of discretion occurs only if a decision is clearly against the logic and effect of the facts and circumstances before the court." *Id.* A showing of error prejudicial to the defendant's substantial rights is required before reversal is warranted. *Id.*

---

[3] In the trial court, Afolabi alleged a due process violation arising from the trial court's denial of a continuance. Although he mentions his right to due process in passing on appeal, he frames the alleged error as an abuse of discretion, not a violation of due process.

[26]     Requests for a continuance are not generally favored and are granted only in the furtherance of justice on a showing of good cause. *Hamilton v. State*, 864 N.E.2d 1104, 1108-09 (Ind. Ct. App. 2007). When a continuance is not required by statute, Indiana's appellate courts use a two-part test to evaluate the denial of a continuance. *Ramirez v. State*, 186 N.E.3d 89, 96 (Ind. Ct. App. 2022). As articulated by this Court in *Ramirez*, "[w]e first determine whether the trial court properly evaluated and compared the parties' diverse interests that would be impacted by altering the schedule." *Id.* (internal quotation marks omitted). If not, we then determine *"*whether the court's denial resulted in prejudice." *Id.*

[27]     Afolabi argues that the trial court did not evaluate and compare the impact that altering the schedule would have on the parties' diverse interests. Noting that the prosecutor expressed a willingness to join Afolabi's motion for a continuance, he contends no diverse interests existed and that the court was therefore required to grant a continuance. But neither *Ramirez* nor the authority upon which it rests goes so far as to say that a trial court must grant a continuance when both parties seek it. *See id.* (discussing *Vaughn v. State*, 590 N.E.2d 134, 135-36 (Ind. 1992)).

[28]     Moreover, the trial court's actions reflect that it considered the interests of both parties. Although the court did not specifically articulate the evaluation or comparison required by *Ramirez*, it conducted a hearing on Afolabi's motion for continuance at the final pretrial hearing and only denied a continuance after hearing arguments from both sides. The defense argued that a continuance was

necessary because it had not received the results from Analyst 2's DNA testing. But the State advised that it had emailed Analyst 2's report to the defense on October 18, 2024—the same day Analyst 2 provided the report to the State.

[29] Although Afolabi paints his counsel's failure to review Analyst 2's report before the final pretrial hearing as a "misunderstanding," emails between the State and Afolabi's counsel on October 18th show otherwise. Appellant's Br., p. 7. The prosecutor emailed Afolabi's counsel on that date and said:

> Attached are the new labs released today. Please let me know if there is a time next week that would work to speak with [Analyst 2]. Based on the labs being completed, I think it is likely that we will go to trial.

App. Vol. II, p. 184.

[30] Afolabi's counsel immediately replied to the State via email and indicated he could not see Analyst 2's report. The prosecutor quickly responded that "[t]he lab result for the sexual assault kit is in the second PDF attached." *Id.* at 185. The prosecutor also summarized the test results, noting that "Mr. Afolabi['s DNA] is found on the anal swabs and 2 cutting[s] from [J.M.'s] underwear." *Id.* Yet, Afolabi's counsel apparently never viewed Analyst 2's report prior to the final pretrial hearing five days later. The record also does not reveal any effort by Afolabi's counsel to schedule a deposition of Analyst 2, although the State stood ready to make her available for a deposition during the week before the scheduled trial.

[31]     Although the prosecutor expressed a willingness to join Afolabi's motion for a continuance of trial, she also told the trial court that the results of Analyst 2's DNA testing were largely consistent with those of Analyst 1's test results.[4] And though the court ultimately denied a continuance, it specifically authorized Afolabi to speak to or depose Analyst 2 before trial. Thus, the court effectively balanced Afolabi's need to prepare his defense with the State's view that the results of Analyst 2's DNA testing were largely consistent with Analyst 1's.

[32]     We also fail to see any unfairness in the trial court granting the State's motion for a continuance but later denying Afolabi's. The State sought a continuance to allow for Analyst 2's testing after Analyst 1's death. The need for Analyst 2's testing was not due to some failure by the State. In contrast, the record does not support Afolabi's contention that, "due to no fault of his own, [he] never had the opportunity to depose any DNA analyst about the first or second set of DNA reports." Appellant's Br., pp. 22-23. When Afolabi sought a continuance, the results of Analyst 1's testing had been known to Afolabi for nearly three years, as they were listed in the probable cause affidavit filed at the beginning of his prosecution. Thus, Afolabi could have avoided his alleged need for a continuance by simply speaking to or deposing Analyst 1 when she was available or by deposing Analyst 2 prior to trial.

---

[4] At the final pretrial hearing, neither side knew of Analyst 2's opinion that Afolabi's DNA was in sperm on J.M.'s underwear. This conclusion was only reflected in Analyst 2's notes, which Afolabi was offered and rejected.

[33] Although Afolabi's initial attempt to depose Analyst 1 in March 2024 failed because Analyst 1 was on medical leave, the record contains no evidence that he ever tried to depose Analyst 1 again before seeking to exclude her testimony in August 2024. Immediately after that, the State discovered Analyst 1 had died. That was when the State obtained a continuance so that M.A.'s plastic bag and J.M.'s anal swabs and underwear could be retested for DNA. The State provided Afolabi with Analyst 2's report from this second round of testing on the same day that the State received it—October 18, 2024—which was 11 days before trial.

[34] Though trial was looming and the trial court had made clear that no further continuances would be granted, the record contains no evidence that Afolabi ever responded to the State's offer to set a date for Analyst 2's deposition during the five days between when the State emailed Analyst 2's report to the defense and the date of the final pretrial hearing. Nor does the record reflect any other effort by Afolabi to speak to or depose Analyst 2 during the six days between the final pretrial hearing and trial, although the trial court specifically invited him to do so.

[35] Afolabi also fails to demonstrate any prejudice to his trial defense resulting from the denial of a continuance. Again, the results of Analyst 2's testing essentially tracked Analyst 1's test results, which had been known to the parties for nearly three years. And Afolabi had six days to speak with or depose Analyst 2 after his motion for a continuance was denied. The record also shows that Afolabi effectively cross-examined Analyst 2 at trial despite not having deposed her.

Moreover, Afolabi points to no gaps in his defense that could have been filled through Analyst 2's deposition.

[36] For all these reasons, the trial court did not abuse its discretion by denying Afolabi's motion for a continuance.

## B. Admission of DNA Evidence

[37] Afolabi alternatively asserts that the trial court erred by admitting Analyst 2's testimony that Afolabi's DNA was found in sperm on J.M.'s underwear. He suggests that the State's belated disclosure of this opinion evidence in Analyst 2's revised report constituted a discovery violation for which the appropriate remedy was exclusion.

[38] Although Afolabi successfully sought to exclude Analyst 2's revised report on the second day of trial, he did not seek to exclude Analyst 2 from testifying about her revised opinion. Afolabi also did not contemporaneously object when Analyst 2 offered the opinion testimony that Afolabi now challenges on appeal. Afolabi argues that he nonetheless preserved this issue for appeal because, on the second day of trial, before Analyst 2 testified, he sought to exclude her testimony about the presence of sperm on J.M.'s underwear. Alternatively, Afolabi claims the trial court committed fundamental error by allowing Analyst 2's testimony.

[39] "A trial court has discretion regarding the admission of evidence[,] and its decisions are reviewed only for abuse of discretion." *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021). This discretion is "broad" when "dealing with

discovery violations by the State in the alleged late disclosure of evidence to the defense." *Alcantar v. State*, 70 N.E.3d 353, 356 (Ind. Ct. App. 2016). "We may reverse the manner in which the trial court deals with such an alleged violation only for an abuse of that discretion involving clear error and resulting prejudice." *Id.*

[40] The fundamental error doctrine, often relied on to save unpreserved claims, is extremely narrow. *Ryan v. State,* 9 N.E.3d 663, 667 (Ind. 2014). It applies only when the error constitutes a blatant denial of basic due process principles that makes it impossible to receive a fair trial. *Id.* at 667-68; *Halliburton v. State*, 1 N.E.3d 670, 678 (Ind. 2013). Thus, under either of Afolabi's alternative claims, he must establish prejudice to obtain reversal. He has failed to do so.

[41] Analyst 2's original, unrevised DNA report—admitted without objection— already showed the presence of Afolabi's DNA on J.M.'s anal swabs and underwear. Given Afolabi's defense that he had no intimate contact with J.M., Analyst 2's testimony suggesting that Afolabi's DNA was found in sperm on J.M.'s underwear is only marginally more probative than the presence of his DNA in such intimate locations alone. And though Afolabi suggested that J.M. had picked up his DNA through other sources and transferred it to her anus and underwear, he offered little evidence to advance that theory.

[42] Moreover, J.M. testified that Afolabi ejaculated inside her vagina the second time he had sexual intercourse with her in the staff bathroom. Footage from a hallway security camera corroborated J.M.'s account that Afolabi followed her

into the bathroom before the sexual intercourse occurred. And evidence from J.M.'s sexual assault examination later that day revealed that J.M. had injuries consistent with her description of the sexual encounter. Thus, Analyst 2's testimony about the presence of sperm on J.M.'s underwear was not the only evidence corroborating J.M.'s testimony that Afolabi had sexual intercourse with her.

[43] Afolabi has failed to show the requisite prejudice arising from the alleged error in the trial court's admission of Analyst 2's testimony. We therefore find no reversible error.

## II. Sufficient Evidence Supports Afolabi's Conviction for the Rape of L.B.

[44] Afolabi next challenges the sufficiency of the evidence to support his conviction for the rape of L.B. "When reviewing the sufficiency of the evidence, we consider only the evidence most favorable to the verdict and all reasonable inferences drawn therefrom without reweighing evidence or reassessing witness credibility." *Farral v. State*, 263 N.E.3d 794, 797 (Ind. Ct. App. 2025). "We will affirm the conviction 'unless no reasonable [factfinder] could find the elements of the crime proven beyond a reasonable doubt.'" *Id.* (quoting *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007)). "The evidence need not 'overcome every reasonable hypothesis of innocence.'" *Id.* (quoting *Drane*, 867 N.E.2d at 147).

[45] To prove Afolabi guilty of the rape, as charged, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally: (1) had sexual

intercourse with L.B. or caused her to perform or submit to other sexual conduct, namely oral sex; (2) when L.B. was "compelled by force or imminent threat of force." Ind. Code § 35-42-4-1(a)(1); *see generally* Ind. Code § 35-31.5-2-221.5 (defining "other sexual conduct" to include "an act involving . . . a sex organ of one (1) person and the mouth . . . of another person").

[46] Afolabi does not dispute that he had sexual intercourse with L.B. or that she performed oral sex on him. But he claims the State presented insufficient evidence to prove he forcefully compelled L.B.'s participation in that sexual conduct. Forceful compulsion "need not be physical or violent" and "may be implied from the circumstances." *Scott-Gordon v. State*, 579 N.E.2d 602, 604 (Ind. 1991). Additionally, "it is the victim's perspective, not the assailant's, from which the presence or absence of forceful compulsion is to be determined." *Tobias v. State*, 666 N.E.2d 68, 72 (Ind. 1996).

[47] According to Afolabi, "the power dynamic of correctional officer/inmate" provided the only evidence of forceful compulsion in this case. Appellant's Br., p. 34. Afolabi contends "[t]here must be something more"; "[o]therwise, almost every sexual misconduct committed by a prison guard would also be rape." *Id.* Contrary to Afolabi's claim, however, L.B.'s testimony and the reasonable inferences arising therefrom support the jury's determination that Afolabi forcefully compelled L.B. to submit to sexual intercourse and perform oral sex.

[48] L.B. testified that Afolabi "cornered" her in a mop closet, grabbed the back of her head, and "made [her] kiss him." Tr. Vol. III, pp. 120, 124. Afolabi then

instructed L.B. to remain in the closet while he briefly left. L.B. "didn't know what to do at that point" and "really didn't think [she] had any choice in anything." *Id.* at 121, 124. When Afolabi returned, he directed L.B. to "suck his d\*\*k." *Id.* L.B. was "scared" and could not get out of the closet, so she complied. *Id.* at 127. After L.B. squatted down, Afolabi grabbed her by the neck and pushed her head toward his penis. After L.B. briefly performed oral sex on Afolabi, he told L.B. to stand up, turn around, and pull down her pants. Afolabi then inserted his penis into her vagina and ejaculated.

[49] This evidence proves far more than just the power dynamic between a correctional officer and an inmate. It shows Afolabi's actions and statements, the circumstances under which they occurred, and L.B.'s real-time perception of them. From this evidence the jury could reasonably conclude that Afolabi compelled L.B. to perform oral sex and submit to sexual intercourse by force or imminent threat of force. We therefore find the evidence sufficient to support Afolabi's conviction for rape as to L.B.

### III. Only One of Afolabi's Intimidation Convictions Places Him in Double Jeopardy

[50] Afolabi's final claim is that his dual convictions for intimidation and rape as to both L.B. and M.A. violate Indiana's prohibition against substantive double jeopardy under *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020). *Wadle* established three progressive steps for evaluating substantive double jeopardy claims that arise "when multiple convictions for a single act or transaction implicate two or more statutes." *Id.* at 253. *Cf. Moyers v. State*, No. 26S-CR-86 at 7-8 (Ind. March

20, 2026) (clarifying that *Wadle* applies when multiple convictions implicate two or more "base offenses" regardless of the number of statutes involved). The *Wadle* steps generally require courts to consider whether: (1) the charging statutes permit multiple punishments; (2) either offense is included in the other; and (3) the defendant's acts constitute a single transaction. *Wadle*, 151 N.E.3d at 253. Whether convictions violate double jeopardy under *Wadle* is a question of law that we review de novo. *Id.* at 237.

## A. Step 1 – Multiple Punishments

At Step 1 of the *Wadle* analysis, we consider the language of the charging statutes to determine whether one "clearly permits multiple punishment, either expressly or by unmistakable implication." *Id.* at 248. If so, the convictions do not constitute substantive double jeopardy, and our inquiry ends. *Id.* If not, we proceed to Step 2. *Id.*

Here, Afolabi's dual convictions for intimidation and rape as to both L.B. and M.A. do not constitute double jeopardy at Step 1 of the *Wadle* analysis because neither of the statutes under which Afolabi was charged clearly permits multiple punishments. *See* Ind. Code § 35-45-2-1 (intimidation); Ind. Code § 35-42-4-1 (rape). We therefore proceed to Step 2 of the *Wadle* analysis.

## B. Step 2 – Included Offenses

At Step 2, we consider the subject offenses to determine whether one is either "inherently" or "factually" included in the other. *A.W. v. State*, 229 N.E.3d 1060, 1067 (Ind. 2024) (clarifying *Wadle* Step 2). If not, the convictions do not

constitute substantive double jeopardy, and our inquiry ends. *Id.* If so, we proceed to Step 3 of the *Wadle* analysis. *Id.*

## i.    Inherent Inclusion

[54]    To determine if an offense is inherently included in another, we apply our included offense statute, Indiana Code § 35-31.5-2-168. *Wadle*, 151 N.E.3d at 253. That statute defines an "included offense" as one that:

> (1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;
>
> (2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or
>
> (3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

Ind. Code § 35-31.5-2-168.

[55]    Here, the State charged Afolabi with rape as to both L.B. and M.A. under Indiana Code § 35-42-4-1(a)(1). That statute provides:

> [A] person who knowingly or intentionally has sexual intercourse with another person or knowingly or intentionally causes another person to perform or submit to other sexual conduct (as defined in IC 35-31.5-2-221.5) when . . . **the other person is compelled by force** or imminent threat of force . . . commits rape, a Level 3 felony.

Ind. Code § 35-42-4-1(a)(1) (emphasis added).

[56] The State charged Afolabi with intimidation as to both L.B. and M.A. under Indiana Code § 35-45-2-1(a)(1). That statute provides: "A person who **communicates a threat** with the intent . . . that another person engage in conduct against the other person's will . . . commits intimidation, a Class A misdemeanor." Ind. Code § 35-45-2-1(a)(1) (emphasis added).

[57] Our included-offense statute is not implicated by Afolabi's dual convictions for intimidation and rape as to both L.B. and M.A. As emphasized in bold above, rape can require proof of an element not required by intimidation (forceful compulsion), and intimidation can require proof of an element not required by rape (a threat). *See* Ind. Code § 35-31.5-2-168(1). Neither offense was charged as an attempt crime. *See id.* § 168(2). And they differ in respects other than degree of harm or culpability. *See id.* § 168(3). Accordingly, intimidation and rape are not inherently included offenses. This conclusion, however, does not end our Step 2 inquiry. We must also consider whether the offenses are factually included.

### ii.    Factual Inclusion

[58] To determine if an offense is factually included in another, we "examine only the facts as presented on the face of the charging instrument." *A.W.*, 229 N.E.3d at 1067 (emphasis omitted). "This includes examining the 'means used to commit the crime charged,' which must 'include all of the elements of the

alleged lesser included offense.'" *Id.* (quoting *Wadle,* 151 N.E.3d at 251). "[W]here ambiguities exist in a charging instrument about whether one offense is factually included in another, courts must construe those ambiguities in the defendant's favor, and thus find a presumptive double jeopardy violation at Step 2." *Id.* at 1069 (internal citation omitted). "In this event, the State can later rebut this presumption at Step 3." [5] *Id.*

[59]   Here, the charging instrument is ambiguous as to whether Afolabi's convictions for intimidation as to both L.B. and M.A. are factually included in his convictions for rape as to those victims. Ambiguity as to one charged crime's factual inclusion in another exists when it is "conceivable," but not certain, from the facts presented on the face of the charging instrument that the means used to commit the alleged greater offense includes all the elements of the

---

[5] We note that a presumption of double jeopardy also arises at Step 2 of the *Wadle* analysis when one offense is factually included in another, unambiguously. It was the State's opportunity to rebut this presumption at Step 3 that required counterbalancing in *A.W.*, at least as *Wadle* was originally "understood." *A.W.*, 229 N.E.3d at 1069. As the *A.W.* Court explained:

> When determining whether one offense is factually included in another at Step 2, *Wadle* construct[ed] an asymmetrical framework benefiting the State in introducing actual evidence. If the prosecutor [did] **not** include facts in the charging instrument establishing one offense is included in another, then there [was] an **irrebuttable** presumption that one offense [was] not factually included in another regardless of how clearly the evidence and arguments at trial reveal that it [was] included. But if the prosecutor **[did]** include facts indicating one offense [was] factually included in another, then there [was] only a **rebuttable** presumption of a double jeopardy violation. Thus, the reviewing court then proceeds to Step 3, where the State can rebut the presumption with tools the defendant could not employ at Step 2—that is, actual evidence.

*Id.* at 1069 n.10 (emphasis in original). The *A.W.* Court "eliminate[d] this asymmetrical benefit to the State" by recognizing that, "where ambiguities exist in a charging instrument about whether one offense is factually included in another," a rebuttable presumption of double jeopardy arises at Step 2. *Id.* at 1069. The Court did not eliminate the presumption that arises under *Wadle* when factual inclusion is unambiguous.

alleged lesser offense. *A.W.*, 229 N.E.3d at 1069; *accord Vanbibber v. State*, 268 N.E.3d 315, 321 (Ind. Ct. App. 2025); *Bradshaw v. State*, 239 N.E.3d 864, 871 (Ind. Ct. App. 2024) (Felix, J., dissenting).

[60] The intimidation charges as to both L.B. and M.A. alleged that "[Afolabi] did communicate a threat to [the victim] . . . with the intent that [the victim] engage in conduct against her will by engaging in sexual conduct with [Afolabi]." App. Vol. II, p. 157. As used in this context, the word "threat" means "an expression, by words or action, of an intention to," among other things, "unlawfully injure [a] person," "unlawfully subject a person to physical confinement or restraint," or "commit a crime." Ind. Code § 35-45-2-1(c).

[61] The rape charge as to L.B. alleged that "[Afolabi] did knowingly or intentionally have sexual intercourse with [L.B.] and/or cause [L.B.] to perform or submit to other sexual conduct . . . when such person was compelled by force or imminent threat of force." App. Vol. II, p. 158. Similarly, the rape charge as to M.A. alleged that "[Afolabi] did knowingly or intentionally cause [M.A.] to perform or submit to other sexual conduct . . . when such person was compelled by force or imminent threat of force." *Id.*

[62] Because rape by imminent threat of force is effectively successful intimidation, it is conceivable that the means used to commit the rapes of both L.B. and M.A. factually included all the elements of the intimidation charges. But the charging instrument, by simply tracking the language of the statutes, did not disclose the

means allegedly used to commit the charged crimes. Thus, we cannot discern from it whether Afolabi used the same threat to both rape and intimidate each victim. It is also possible that the rapes were actually committed by force, not imminent threat of force. These ambiguities give rise to a presumption of double jeopardy at Step 2 of the *Wadle* analysis. *A.W.*, 229 N.E.3d at 1067. And the State has the burden of rebutting this presumption at Step 3. *Id.*

## C. Step 3 – Single Transaction

At Step 3 of the *Wadle* analysis, we consider the facts underlying the challenged convictions, "as presented in the charging instrument and as adduced at trial," to determine whether the defendant's actions were "so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *Wadle*, 151 N.E.3d at 249 (citation omitted). If so, the convictions constitute substantive double jeopardy. *Id.* If not, double jeopardy does not arise. *Id.* Either way, our analysis ends.

To accomplish Step 3, however, we must first identify which of the defendant's actions to analyze. This is not a call for post hoc explanations of how the evidence could have been allocated between the offenses to avoid substantive double jeopardy. Rather, "[t]he State must demonstrate that it made clear to the [factfinder] at trial that the apparently included charge was supported by independent evidence such that the State made a 'distinction between what would otherwise be two of the same offenses.'" *Ratliff v. State*, 242 N.E.3d 1070,

1078-79 (Ind. Ct. App. 2024) (quoting *A.W.*, 229 N.E.3d at 1071), *trans. denied*.[6] To require less would render Step 2's presumption of double jeopardy largely without meaning.

### i.     Double Jeopardy as to L.B.

[65]     The State attempts to rebut the double jeopardy presumption as to L.B. by claiming the intimidation "occurred when [Afolabi] first encountered L.B. in the mop closet, grabbed her by the back of the head, forced L.B. to kiss him, and instructed her to wait in the closet." Appellee's Br. p. 33. In contrast, the State contends the forceful compulsion for the rape "occurred several minutes later when [Afolabi] returned to the mop closet, grabbed L.B. by the neck and pushed her head onto his penis, and then grabbed her and penetrated her vagina with his penis." *Id.* According to the State, these two sequences were "not so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *Id.*

[66]     But the State did not make this evidentiary distinction at trial. Instead, during closing arguments, the prosecutor described the intimidation as follows: "[L.B.] was told what to do, pushed up against the wall. She felt scared. She felt intimidated." Tr. Vol. IV, p. 53. The prosecutor then described the rape as follows: "[L.B.] was forced against the wall and in those brief moments she was

---

[6] *Accord Eversole v. State*, 251 N.E.3d 604, 608-09 (Ind. Ct. App. 2025), *trans. denied*; *Bolcerek v. State*, 255 N.E.3d 1206, 1219 (Ind. Ct. App. 2025), *trans. denied*; *Denny v. State*, 272 N.E.3d 210, 216 (Ind. Ct. App. 2025); *Brothers. v. State*, 271 N.E.3d 589, 596 (Ind. Ct. App. 2025).

forced to perform oral sex on [Afolabi] with imminent threat of force." *Id.* at 58. As the record contains no direct evidence that Afolabi pushed L.B. against a wall, we understand the prosecutor's descriptions as referring to Afolabi's general act of cornering L.B. in the mop closet, grabbing and instructing her to remain there. Thus, as argued by the prosecutor, the same actions by Afolabi proved both the threat underlying the intimidation charge and the force or threat of force underlying the rape charge.

[67] Our review of the record further reveals that the evidence adduced at trial did not otherwise make clear to the factfinder that the intimidation and rape of L.B. were based on distinct actions by Afolabi, as the State claims on appeal. When the prosecutor asked L.B., "What w[ere] some of the things that Officer Afolabi was doing that made you feel forced?," L.B. testified, "He would grab me by the back of my head, made me kiss him." Tr. Vol. III, p. 124. L.B. also answered "Yes" when the prosecutor confoundingly asked her: "Okay, so it was the verbal (sic) that ultimately led up to that kissing, the touching, the grabbing, forcing and the rape?" *Id.* at 128.

[68] The State has failed to rebut the presumption of double jeopardy as to Afolabi's dual convictions for the intimidation and rape of L.B. As his conviction for the intimidation of L.B. is contrary to law, we remand for the trial court to vacate that conviction and its corresponding one-year concurrent sentence.

## ii.    No Double Jeopardy as to M.A.

[69]    We reach a different conclusion as to Afolabi's conviction for the intimidation of M.A. During closing statements, the prosecutor argued that the intimidation occurred when, after M.A. initially refused to perform oral sex on Afolabi, he issued M.A. a disciplinary report for trafficking bubblegum and stated, "I thought you [would] do anything to go home." Tr. Vol. IV, p. 55. In contrast, the prosecutor argued that the rape occurred when Afolabi returned to M.A.'s cell a few weeks later and, after attempting to have sexual intercourse with M.A., "pinched" her clitoris, "pushed" her down, and forced her to perform oral sex on him. *Id.* at 56.

[70]    As argued by the prosecutor, distinct actions by Afolabi proved the threat underlying the intimidation charge and the force underlying the rape charge. And the evidence adduced at trial further made clear to the factfinder that each of Afolabi's offenses was based on independent facts. *See, e.g.*, Tr. Vol. III, pp. 170-73 (prosecutor questioning M.A. about "another sexual assault" by Afolabi and the "first," "second," and "next time" Afolabi sexually assaulted her). Moreover, M.A.'s own testimony reveals that the rape occurred "a couple of weeks" after the intimidation. *Id.* at 170. Thus, the two offenses did not constitute a "single transaction." *Wadle*, 151 N.E.3d at 249

[71]    The State has successfully rebutted the presumption of double jeopardy as to Afolabi's dual convictions for rape and intimidation as to M.A. Accordingly, those convictions are not contrary to law.

## Conclusion

We conclude that trial court did not abuse its discretion by denying Afolabi's request for a continuance to depose Analyst 2 and did not commit reversible error by allowing Analyst 2 to testify regarding the presence of sperm on J.M.'s underwear. We also find sufficient evidence to support Afolabi's conviction for the rape of L.B. Additionally, we find his dual convictions for the intimidation and rape of M.A. did not constitute substantive double jeopardy. However, we find double jeopardy in Afolabi's dual convictions for the intimidation and rape of L.B. We therefore remand for the trial court to vacate that intimidation conviction and the corresponding one-year concurrent sentence. We otherwise affirm.

Affirmed in part and remanded in part.

Bradford, J., and DeBoer, J., concur.


ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana